# Supreme Court of Texas

No. 23-0629

State of Texas; Ken Paxton, in his official capacity as Attorney General of Texas; Texas Medical Board; and Stephen Brint Carlton, in his official capacity as Executive Director of the Texas Medical Board,

*Appellants,*

v.

Amanda Zurawski; Lauren Miller; Lauren Hall; Anna Zargarian; Ashley Brandt; Kylie Beaton; Jessica Bernardo; Samantha Casiano; Austin Dennard, D.O.; Taylor Edwards; Kiersten Hogan; Lauren Van Vleet; Elizabeth Weller; Damla Karsan, M.D., on behalf of herself and her patients; and Judy Levison, M.D., M.P.H., on behalf of herself and her patients,

*Appellees*

On Direct Appeal from the
353rd District Court, Travis County, Texas

**Argued November 28, 2023**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE LEHRMANN filed a concurring opinion.

JUSTICE BUSBY filed a concurring opinion, in which Justice Lehrmann joined.

Texas law permits a life-saving abortion. A physician cannot be fined or disciplined for performing an abortion when the physician, exercising reasonable medical judgment, concludes (1) a pregnant woman has a life-threatening physical condition, and (2) that condition poses a risk of death or serious physical impairment unless an abortion is performed. After the United States Supreme Court overturned *Roe v. Wade*, current Texas law otherwise generally prohibits performing an abortion.

This case comes to us as a direct appeal from a temporary injunction stopping enforcement of Texas's abortion laws in various circumstances. The plaintiffs include women who suffered serious complications during their pregnancies—situations filled with immense personal heartbreak. The State does not contest that at least some of these complications present life-threatening conditions for which an abortion may be indicated. In amendments to Texas law during the last regular legislative session, the Legislature expressly permitted abortion for one of the pregnancy complications presented in this case. The law can be—and has been—amended to reflect policy choices on abortion. Keeping that in mind, we turn to answer the legal questions this appeal presents.

We hold that Dr. Damla Karsan, a physician–plaintiff in this suit, has standing to challenge the Attorney General's enforcement of the Human Life Protection Act against her. We further conclude that the Declaratory Judgments Act waives the State's immunity for a claim that a statute violates the state constitution. Although a party may not sue

2

to seek construction of a statute in the abstract, a court may interpret a statute when it is a necessary part of resolving constitutional claims.

Under the Human Life Protection Act, a woman with a life-threatening physical condition and her physician have the legal authority to proceed with an abortion to save the woman's life or major bodily function, in the exercise of reasonable medical judgment and with the woman's informed consent.[1] As our Court recently held, the law does not require that a woman's death be imminent or that she first suffer physical impairment.[2] Rather, Texas law permits a physician to address the risk that a life-threatening condition poses before a woman suffers the consequences of that risk. A physician who tells a patient, "Your life is threatened by a complication that has arisen during your pregnancy, and you may die, or there is a serious risk you will suffer substantial physical impairment unless an abortion is performed," and in the same breath states "but the law won't allow me to provide an abortion in these circumstances" is simply wrong in that legal assessment.

Given this construction, we conclude that Dr. Karsan has not demonstrated that the part of the Human Life Protection Act that permits life-saving abortion is narrower than the Texas Constitution allows. Because the trial court's injunction departed from the law without constitutional justification, we vacate its order.

---

[1] Tex. Health & Safety Code § 170A.002.

[2] *In re State*, 682 S.W.3d 890, 894 (Tex. 2023).

3

**I**

**Facts and Procedural History**

**A**

**Claims and Contentions**

The Center for Reproductive Rights, on behalf of several Texas plaintiffs, sued the State through the Attorney General and the Texas Medical Board, challenging aspects of Texas's abortion laws. The Center seeks (1) an interpretation of the Texas law that permits life-saving abortions and (2) to rewrite that law to change the circumstances in which Texas law must permit an abortion. Absent judicial adoption of the Center's preferred state abortion policy, it contends, the state's laws are unconstitutional.

Among the plaintiffs are several Texas women and two physicians who treat pregnant women.[3] The Center alleges that the complications the women faced during their pregnancies placed them within existing Texas law that permits life-saving abortion. However, it alleges, the Texas doctors who treated the women were hesitant to perform abortions that comply with the law for fear of legal consequences. As a result, the Center further alleges, the women either did not receive the

---

[3] We confine our review to the evidence presented at the temporary injunction hearing. A party seeking injunctive relief has the burden of pleading and proving a probable right to relief. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A trial court abuses its discretion if it enters a temporary injunction unsupported by the evidence. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998). The trial court properly excluded affidavit evidence. *Millwrights Loc. Union No. 2484 v. Rust Eng'g Co.*, 433 S.W.2d 683, 686 (Tex. 1968) (noting "the proof required to support a judgment issuing a writ of temporary injunction may not be made by affidavit" in the absence of agreement).

4

abortions that Texas law permits or were delayed in receiving abortions in Texas or out of state.

The Center sought relief against the State, the Attorney General, and the Texas Medical Board, seeking an injunction to stop enforcement of three sets of Texas abortion laws:

- The Human Life Protection Act, found in Chapter 170A of the Health and Safety Code, which imposes civil and criminal liability against abortion providers who violate it;

- Former Texas Penal Code articles 1191–1196,[4] last amended in 1925, and now codified at Chapter 6 1/2 of the revised civil statutes, making it a criminal offense to provide an abortion; and

- The Heartbeat Act, found in Health and Safety Code Sections 171.203–205, a private-enforcement statute.

Each of these laws permits abortions performed to save the life of the mother, though using different language. The Center acknowledges as much, but it argues that the laws are unclear. As a result, it contends, there are physicians in Texas who have refused to provide abortions that Texas law currently permits.

The State sought to dismiss the case through a plea to the jurisdiction, urging that:

- No state official has enforced any Texas abortion law against any of these plaintiffs.

- The state officials named in this case—the Attorney General and the Director of the Texas Medical Board—have no authority to enforce Texas criminal laws.

- The trial court had no jurisdiction to interpret the law under the Declaratory Judgments Act.

---

[4] Tex. Rev. Civ. Stat. arts. 4512.1–.6.

5

- Current Texas law permitting life-saving abortion is not more limiting than the Texas Constitution permits.

The State also invoked sovereign immunity, arguing that the Declaratory Judgments Act does not waive the State's immunity when a party sues to seek an interpretation of the law in connection with hypothetical facts.

## B

## The Trial Court Hearing

The trial court heard testimony from four patients, one physician, and three experts.

Amanda Zurawski testified that she was seventeen weeks pregnant with her first child when her doctor diagnosed her with a premature dilation of the cervix and informed her that a miscarriage was inevitable. A second opinion from a maternal–fetal medicine doctor confirmed that diagnosis. Ms. Zurawski had suffered a preterm pre-labor rupture of membranes (sometimes referred to as PPROM). Tragically, she learned that she "was going to lose the baby with complete certainty."

Ms. Zurawski testified that her doctors refused to perform an abortion immediately because the baby's heart was still beating. They sent her home but advised her to remain near the hospital due to the risk of infection. Three days later, Ms. Zurawski developed septic shock. At that point, doctors induced delivery of her stillborn daughter, whom she named Willow. Ms. Zurawski remained in intensive care for three days. Scarring from the infection was so severe that she required surgical reconstruction of her uterus and lost the use of one of her fallopian tubes.

Ashley Brandt testified that she was twelve weeks pregnant with twins when her doctor diagnosed one of the babies with a "100 percent fatal" condition called acrania, a type of neural-tube defect. The baby's skull had failed to fuse. As the condition progressed, eventually the baby's heart would stop, likely triggering labor. If this happened too early in the pregnancy, Ms. Brandt's other, healthy twin would also die. Ms. Brandt desired a procedure in which the twin with the fatal fetal condition is aborted in the hope that the other unborn child would survive. Ms. Brandt also was told that, if her child's condition progressed to anencephaly, Ms. Brandt would likely develop polyhydramnios, an excess of amniotic fluid that placed her at risk of preterm pre-labor rupture of membranes and placental abruption. Ms. Brandt traveled out of state for an abortion and carried her other child to term.

Samantha Casiano testified that she was twenty weeks pregnant when a routine ultrasound revealed that her daughter had anencephaly. Because her physician would not perform an abortion, Ms. Casiano carried her daughter, whom she named Halo, for another three months until she was born prematurely. Halo died in Ms. Casiano's arms four hours after she was born.

Dr. Austin Dennard, an obstetrician–gynecologist practicing in Dallas, testified that her eleven-week ultrasound revealed "something catastrophically wrong." Dr. Dennard's baby was diagnosed with anencephaly. From her training and experience, Dr. Dennard knew "[t]here's no chance of survival and that each day that I remained pregnant, my physical life was more and more at risk." Dr. Dennard elected to travel out of state to receive an abortion.

7

Dr. Damla Karsan, a physician–plaintiff, is an obstetrician–gynecologist managing her own practice with privileges at hospitals in Houston. For some pregnancy complications, Dr. Karsan testified that the standard of care is to offer the patient the option of an abortion. Preterm pre-labor rupture of membranes is one such condition because it inevitably results in an infection. In her view, severe fetal abnormalities are another because the risks associated with pregnancy such as hemorrhage, infection, and preeclampsia outweigh the chance of the pregnancy resulting in a healthy child. Dr. Karsan testified that Texas's abortion laws "amplified the fear and reluctance to offer a patient an abortion, even if I thought it might pass the exceptions within the law."

Dr. Karsan described a patient who was fifteen weeks pregnant and experiencing significant bleeding, whose unborn child was diagnosed with anencephaly. "[N]ot only was she carrying a fetus that had no chance of survival, she had a heightened risk for hemorrhage because she had a subchorionic bleed and had already . . . bled a significant amount." Dr. Karsan believed the patient should be offered an abortion. However, the hospital required the agreement of two physicians before proceeding. The maternal–fetal medicine specialist who consulted on the case did not concur with Dr. Karsan's assessment that an abortion was indicated at that time.

The Center presented two experts, one in maternal–fetal medicine and the other in emergency medicine. The maternal–fetal medicine expert testified that physicians should be allowed to determine whether an abortion is medically necessary in any given circumstance.

8

The expert also opined that there are some medical indications for an abortion that may not be covered by the current Texas laws that permit life-saving abortions. The emergency-medicine expert testified that confusion about the law is leading physicians to err on the side of not treating their patients. In that expert's view, Texas law should permit physicians to act in good faith.

The State defendants also presented an expert, an obstetrician–gynecologist practicing in San Antonio. The State's expert testified that she, too, has cared for patients with severe complications that required intervention by abortion to save a woman's life. She testified that "[m]ost doctors know how to intervene and when to intervene for life-threatening emergencies." In her view, the confusion around the laws permitting life-saving abortion is attributable to the failure to provide guidance, not the law:

> I think it is clear that the Texas law allows treatment of life-threatening conditions. I have seen that there is confusion and many physicians who don't understand what the law says, and I think that has resulted in suboptimal care. It is not the law's fault. The law is quite clear.

Noting that current Texas law imposes no temporal limits for a life-saving abortion, the State's expert urged doctors to not "wait until a woman is in danger of losing her life before you intervene."

## C

### Procedural History

After the hearing, the trial court ordered a temporary injunction. The injunction stopped the State defendants from:

> enforcing Texas's abortion bans against physicians who provide abortion care and those that aid or abet in the

9

provision of abortion care for any pregnant person who, in the treating physician's good faith judgment . . . has: (1) a complication of pregnancy that poses a risk of infection or otherwise makes continuing a pregnancy unsafe for the pregnant person; (2) a condition exacerbated by pregnancy, that cannot be effectively treated during pregnancy, or that requires recurrent invasive intervention; and/or (3) a fetal condition where the fetus is unlikely to survive the pregnancy and sustain life after birth.

According to the trial court's order, official enforcement of the abortion laws otherwise "would be inconsistent with Article 1, §§ 3, 3a, and/or 19 of the Texas Constitution." The court also declared the Heartbeat Act unconstitutional under Article 1, Section 13 of the Texas Constitution, though the Center did not raise such a challenge. The trial court denied the State's plea to the jurisdiction.

The State defendants directly appealed to this Court.[5]

## II

## Standing

We begin with jurisdiction. The State challenges the plaintiffs' standing and asserts sovereign immunity. Both doctrines implicate a court's power to decide this case. For every court case, "subject-matter jurisdiction must exist before we can consider the merits," and a court must examine its jurisdiction "any time it is in doubt."[6]

---

[5] *See* Tex. Gov't Code § 22.001(c) ("An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state.").

[6] *Tex. Propane Gas Ass'n v. City of Houston*, 622 S.W.3d 791, 797 (Tex. 2021) (quoting *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020)).

10

A plaintiff must have standing to sue.[7] Part of that analysis depends on whether a plaintiff has alleged an injury that her lawsuit can vindicate. A plaintiff's general disagreement about the governing law or what the law should be does not suffice. Otherwise, anyone could approach a court for an opinion about hypothetical applications of the law. Instead, the relief that a plaintiff seeks from a court must in some way rectify or compensate the plaintiff for her alleged injury. In other words, to have standing, a plaintiff must allege a concrete personal injury that is both traceable to the defendant's conduct and likely redressable by the requested relief.[8]

In this case, the State challenges three aspects of standing. First, the State argues that a plaintiff must specifically allege that the State has sought to enforce the law against her; otherwise, no concrete dispute exists for a court to resolve.[9] Second, the State observes that the defendants named in this case do not enforce criminal laws. An order stopping enforcement of laws that the defendants have no authority to enforce does not redress a concrete injury. The State concedes, however, that the Attorney General and the Texas Medical Board possess some

---

[7] *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) ("A court has no jurisdiction over a claim made by a plaintiff without standing to assert it.").

[8] *Heckman v. Williamson County*, 369 S.W.3d 137, 154–55 (Tex. 2012) (incorporating Article III standing analysis in the Texas framework).

[9] *In re Abbott*, 601 S.W.3d 802, 812 (Tex. 2020) ("To establish standing based on a perceived threat of injury that has not yet come to pass, the 'threatened injury must be certainly impending to constitute injury in fact'; mere 'allegations of possible future injury' are not sufficient." (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))).

civil-enforcement powers. Third, the State argues that the plaintiffs cannot remedy their alleged injuries through this lawsuit. The plaintiffs do not trace their injury to a state official. Their doctors refused to perform abortions, but the Center does not allege that a state official intervened or told any of the plaintiffs' doctors not to perform an abortion in the circumstances presented.

## A

## Specific Threat of Enforcement

We first examine whether the Center has adequately alleged a specific threat of enforcement against any of the plaintiffs. To directly challenge the constitutionality of a statute, a plaintiff must allege that the plaintiff (1) intends to engage in conduct that is arguably constitutionally protected but not permitted by the statute and (2) faces a credible threat of prosecution under that law.[10]

At the outset, the Center argued that a general enforcement statement by the Attorney General was enough to establish standing to sue. A week after the Court heard oral argument in this case, however, the Center filed a suit against the State defendants on behalf of Dr. Karsan—a plaintiff in this case—and a Texas mother and her husband.

After a trial court ordered an injunction in favor of Dr. Karsan, the Attorney General sent letters to three Houston hospitals

---

[10] *Id.* (holding that the plaintiff must "allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder'" (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).

12

threatening liability if the hospitals permitted Dr. Karsan to perform an abortion under the auspices of the order. The letter warns that the order "will not insulate you, or anyone else, from civil and criminal liability for violating Texas' abortion laws, including first degree felony prosecutions, Tex. Health & Safety Code § 170A.004, and civil penalties of not less than $100,000 for each violation, Tex. Health & Safety Code §§ 170A.005, 171.207-211." The Center filed the Attorney General's letter in this case, and it is part of the record in this Court.

We conclude that the Attorney General directly threatened enforcement against Dr. Karsan in response to her stated intent to engage in what she contends is constitutionally protected activity. A state official's letter threatening enforcement of a specific law against a plaintiff seeking relief from such enforcement is a sufficient showing of a threat of enforcement to establish standing to sue.[11] Although ordinarily courts must determine standing based on facts pleaded at the outset of the suit,[12] in this case, the Center pleaded the threat of enforcement and adduced facts demonstrating that a specific threat of enforcement had taken place.[13] Dr. Karsan has not shown that the

---

[11] *See Abbott v. Harris County*, 672 S.W.3d 1, 9 (Tex. 2023) (concluding that letters to plaintiffs threatening enforcement and enforcement actions against others sufficiently established threat of enforcement).

[12] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 n.9 (Tex. 1993).

[13] *See Perry v. Del Rio*, 66 S.W.3d 239, 251–52 (Tex. 2001) ("[A] claim's lack of ripeness when filed is not a jurisdictional infirmity requiring dismissal if the case has matured.").

Texas Medical Board has threatened enforcement. She thus has not established standing as to it.

When multiple plaintiffs seek relief against enforcement of a law, the existence of one plaintiff with standing is sufficient to support litigation of the claim as to that plaintiff.[14] Dr. Karsan has met the threshold requirement of a threat of enforcement against her. We address Dr. Karsan's claims in association with her case against the Attorney General.

## B

### Enforcement Authority

The second part of a credible threat of enforcement is a State defendant's authority to enforce the challenged law. An injunction is an empty vessel if the enjoined official never had the power to enforce the law in the first place.

We addressed this essential requirement in *In re Abbott*.[15] There, our Court held that no credible threat of criminal prosecution could exist because neither the Governor nor the Attorney General had any authority to initiate criminal prosecutions.[16] The plaintiffs thus lacked standing to enjoin those officials from initiating criminal prosecutions.[17] Similarly, in this case, of the three laws generally prohibiting abortion,

---

[14] *Heckman*, 369 S.W.3d at 152 n.64. Other than the letters threatening enforcement against Dr. Karsan, the Center made no showing of state enforcement against any plaintiff.

[15] 601 S.W.3d at 812.

[16] *Id.*

[17] *Id.* at 812–13.

the Attorney General is authorized to enforce only one: the Attorney General may recover civil penalties for violations of the Human Life Protection Act.[18] Local district or county attorneys may prosecute criminal violations of the Penal Code or the Human Life Protection Act, not the Attorney General.[19] Further, the Attorney General has no authority to enforce the Heartbeat Act.[20]

The Center responds that it may seek a global injunction by naming the State generally. This proposition finds no support in Texas law. Rather, in Texas, a suit brought against the State must be dismissed unless the state official named in the suit has enforcement authority.[21] In *Abbott v. Mexican American Legislative Caucus*, for example, a group sued the State without naming a state official.[22] Relying on longstanding precedent, we held that the group lacked standing because "the State itself has no enforcement authority" over the challenged laws.[23] Suits against the State do not sweep in every officer operating under the State's authority; rather, a plaintiff must

---

[18] Tex. Health & Safety Code § 170A.005. The Texas Medical Board "shall revoke the license" of a physician who violates the Act. *Id.* § 170A.007. Though the State does not dispute that the Board has some civil enforcement power, a disciplinary proceeding does not result in the imposition of criminal liability.

[19] *State v. Stephens*, 663 S.W.3d 45, 47, 52 (Tex. Crim. App. 2021).

[20] *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 575 (Tex. 2022); *see also* Tex. Health & Safety Code § 171.207(a).

[21] *Abbott v. Mexican Am. Legis. Caucus*, 647 S.W.3d 681, 696–98 (Tex. 2022).

[22] *Id.*

[23] *Id.* at 698.

identify and name the officer or agency with authority to enforce the challenged law.[24] Accordingly, we confine our review to the Attorney General's threat of enforcement of the Human Life Protection Act.

## C

## Redressability

Third, we examine whether the relief Dr. Karsan seeks can redress the injuries she alleges. "Redressability" means that "there is a substantial likelihood that the requested relief will remedy the alleged injury."[25] Dr. Karsan's claims regarding the Human Life Protection Act's civil enforcement are redressable by a favorable injunction. An injunction restraining the Attorney General—a state official with authority to act—redresses Dr. Karsan's alleged injury of civil prosecution under a law she challenges as unconstitutional.[26]

Dr. Karsan's injury is different from a woman's assertion of a constitutional right to obtain an abortion.[27] Under the Human Life

---

[24] Dr. Karsan claims that the Texas Medical Board enforces criminal laws through disciplinary proceedings; however, as we have held, the Texas Medical Board has not threatened Dr. Karsan with enforcement or removal of her license based on a violation of the criminal—or any—law. Thus, she has not established standing to sue the Board.

[25] *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018) (citing *Heckman*, 369 S.W.3d at 155–56).

[26] To seek relief against the State, a claimed injury must be traceable to the State, not "the result of the independent action of some third party not before the court." *Heckman*, 369 S.W.3d at 154 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Unlike Dr. Karsan, the patients' claims for relief therefore cannot be redressed by an injunction against the Attorney General.

[27] Because we conclude Dr. Karsan has standing in her own right, we need not decide whether a physician may challenge laws that allegedly infringe

16

Protection Act, a woman who obtains an abortion cannot be prosecuted.[28] The law instead aims at those who unlawfully provide an abortion. Dr. Karsan has standing to bring her own claim, in which she asserts she has a constitutional right to a lawful occupation the Act impedes. We address Dr. Karsan's constitutional challenges in that context.

To summarize, we conclude that Dr. Karsan has standing to bring her claims against the Attorney General, insofar as she challenges civil enforcement of the Human Life Protection Act.

## III

### Sovereign Immunity

The State's second challenge to the trial court's jurisdiction is that sovereign immunity bars the Center's claims. Under the doctrine of sovereign immunity, the State and its officers are shielded from judicial scrutiny unless the State consents to suit.[29] The Center responds that the Declaratory Judgments Act waives immunity.

The Declaratory Judgments Act "does not contain a general waiver of sovereign immunity" for claims for declaratory judgment

---

upon the constitutional rights of her patients. Ordinarily "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *see also Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995) ("Second, the plaintiff must contend that the statute unconstitutionally restricts the *plaintiff's* rights, not somebody else's.").

[28] Tex. Health & Safety Code § 170A.003.

[29] *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017).

17

against the government.[30] Instead, it provides "only a limited waiver for challenges to the *validity* of an ordinance or statute."[31] Claims for "other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action."[32] Thus, to obtain declaratory relief against the government, it is necessary to show that the challenged law is invalid because it is unconstitutional, preempted by superior governing law, or barred for some similar reason. The Declaratory Judgments Act does not permit a suit merely seeking guidance about the application of the law to particular facts.[33]

---

[30] *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 552 (Tex. 2019).

[31] *Id.* (emphasis added); *see also Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) ("[T]he [Uniform Declaratory Judgments Act] does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law.").

[32] *Shady Shores*, 590 S.W.3d at 553 (citing *Sefzik*, 355 S.W.3d at 621). In *Shady Shores*, a former municipal employee cast her wrongful termination suit as a suit for declaratory judgment that her termination violated the Open Meetings Act as well as the due course of law provision of the Texas Constitution. *Id.* at 547. Because the former employee was not seeking a declaration regarding the validity of an ordinance or statute, we held that she must look to an independent legislative waiver of immunity outside the Declaratory Judgments Act. *Id.* at 553.

[33] A plaintiff who alleges that a state actor is improperly applying the law through ongoing enforcement may instead bring an ultra vires claim against that official. *See Sefzik*, 355 S.W.3d at 621–22 (holding that an applicant challenging an agency's denial of a permit did not plead a valid Declaratory Judgments Act claim because the applicant did not challenge the validity of a statute but the validity of an officer's actions taken in applying the statute); *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388–89 (Tex. 2011) (holding suit seeking declaration that streambed was not navigable brought under the Declaratory Judgments Act was barred by sovereign immunity but allowing plaintiff to replead ultra vires claims). The Center alternatively argues that the ultra vires exception to sovereign immunity

In this case, however, interpretation of the Human Life Protection Act is a part of determining its constitutionality. The constitutional challenges Dr. Karsan raises distinguish her declaratory judgment claim from those cases in which a plaintiff raises no challenge to the constitutional validity of the law in dispute. Courts are compelled to give laws a constitutional reading if a constitutional reading can be had. [34] This rule of construction does not, however, overcome the waiver of sovereign immunity the Declaratory Judgments Act provides when a state law's constitutional validity is under review. [35]

The State responds that "immunity from suit is not waived if the constitutional claims are facially invalid." [36] That much is true. Ultimately, if a constitutional challenge lacks merit, then the plaintiff is not entitled to declaratory relief. Often, however, courts must interpret the law to determine whether that law infringes on the claimed

---

applies. Because we consider Dr. Karsan's claims under the Declaratory Judgments Act despite the State's assertion of immunity, we need not reach her ultra vires claim.

[34] *Paxton v. Longoria*, 646 S.W.3d 532, 539 (Tex. 2022) ("Under the canon of constitutional avoidance, we should, 'if possible,' interpret a statute in a manner that avoids constitutional infirmity." (quoting *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998))).

[35] *See Mexican Am. Legis. Caucus*, 647 S.W.3d at 698–99 (observing that jurisdiction turns on the validity of asserted constitutional claims, which in turn depends on interpretation of the statute).

[36] *See id.* at 698 (quoting *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015)).

constitutional right.[37] The validity of a challenge to the law in such cases is intertwined with its interpretation. Such is the case here.

Recognizing that Dr. Karsan's constitutional claims turn in part on the construction of the Human Life Protection Act, we next turn to it.

## IV

## The Human Life Protection Act

The Human Life Protection Act permits an abortion when:

> in the exercise of *reasonable medical judgment*, the pregnant female on whom the abortion is performed, induced, or attempted *has a life-threatening physical condition* aggravated by, caused by, or arising from a pregnancy *that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed* or induced.[38]

An abortion performed in compliance with this provision does not violate the statute.

The trial court's order replaces this enacted law in two significant ways. First, the order replaces the statutory text, which uses "reasonable medical judgment," with "good faith judgment."

The two are not diametric opposites. Presumably a doctor using reasonable medical judgment most often is also acting in good faith. And a doctor acting in good faith presumably often does so by exercising reasonable medical judgment. Nonetheless, the Center argues that a

---

[37] *E.g.*, *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (proceeding to the merits "cognizant that the [State] retains immunity from suit unless the [plaintiffs] have pleaded a viable claim").

[38] Tex. Health & Safety Code § 170A.002(b)(2) (emphases added). Paraphrases of this statute in this opinion are not intended to supplant the statutory text. As always, the statutory text provides the governing rule.

subjective standard like good faith must replace the objective reasonable medical judgment standard that the law employs.

Second, the trial court's order replaces "life-threatening physical condition" with a different standard that includes, more generally: (1) any "unsafe" pregnancy, (2) conditions "that cannot be effectively treated during pregnancy" without "recurrent invasive intervention," and (3) "fetal condition[s]" where the unborn child is "unlikely to survive" or to "sustain life after birth." Again, the two are not diametrically opposed. For example, a pregnancy complication that presents "a life-threatening physical condition" to the mother is unsafe. But neither are the order and the statute wholly consistent. The statute as written focuses on a diagnosis of the mother's physical condition. In contrast, the trial court's order permits an abortion without the diagnosis that the mother has a life-threatening physical condition.

Although there are other differences, these departures from the law as written are the ones the Center urges courts to embrace to render the Human Life Protection Act constitutional.

## A

### Reasonable Medical Judgment

We first examine the law permitting abortion "in the exercise of reasonable medical judgment." The law does not leave the reader to wonder what this means. Instead, the law gives a definition commonly understood in the medical profession. "Reasonable medical judgment" is "a medical judgment made by a reasonably prudent physician,

knowledgeable about a case and the treatment possibilities for the medical conditions involved."[39]

We examined the meaning of "reasonable medical judgment" in *In re State*.[40] In that case, the trial court replaced "reasonable medical judgment" with "good faith belief." While we observed some overlap, we held that the law does not permit an abortion based on belief alone.[41] Rather, a doctor must identify a life-threatening physical condition that places the mother at risk of death or serious physical impairment of a major bodily function unless an abortion is performed.[42]

The Center argues that such a standard means that doctors are susceptible to a battle of the experts when not every doctor might reach the same medical judgment in each case. We rejected such an interpretation in *In re State*. "Reasonable medical judgment," we held, "does not mean that every doctor would reach the same conclusion."[43] Rather, in an enforcement action under the Human Life Protection Act, the burden is the State's to prove that *no* reasonable physician would have concluded that the mother had a life-threatening physical condition that placed her at risk of death or of substantial impairment of a major bodily function unless the abortion was performed.[44]

---

[39] Tex. Health & Safety Code § 170A.001(4).

[40] 682 S.W.3d 890.

[41] *Id.* at 894.

[42] *Id.*

[43] *Id.*

[44] The standard echoes widely used reasonable care standards that govern the medical profession in other contexts. "In a medical malpractice

The Center favors a law that would examine a particular doctor's intent in proceeding with an abortion. Contrary to its assessment, a subjective standard is less insulating of a physician's decision-making than the objective one that the Legislature has adopted. As the State's expert observed, physicians can turn to peer-reviewed best practices associated with a patient's particular diagnosis and treatment.

A subjective standard, in contrast, examines a doctor's intent instead of medical facts.[45] This intent would be subject to scrutiny based on a physician's views about abortion and its availability. Regardless of those views, the law permits an abortion when reasonable medical judgment would find one indicated to avert death or substantial bodily impairment of a pregnant woman diagnosed with a life-threatening physical condition arising from or aggravated by her pregnancy. With confirmation of those facts through the exercise of reasonable medical

---

negligence case, the standard of care is what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). "Reasonable medical judgment" has been part of the regulation of abortion since 2013. Preborn Pain Act, 83d Leg., 2d C.S., ch. 1, § 3, 2013 Tex. Gen. Laws 5013, 5014 (codified at Tex. Health & Safety Code § 171.046) (banning abortions performed more than twenty weeks post-fertilization unless "there exists a condition that, in the physician's reasonable medical judgment, so complicates the medical condition of the woman that, to avert the woman's death or a serious risk of substantial and irreversible physical impairment of a major bodily function, other than a psychological condition, it necessitates" an abortion).

[45] A doctor's intent is relevant to other aspects of the law. An act is not an "abortion" unless done "with the intent to cause the death of an unborn child of a woman known to be pregnant." Tex. Health & Safety Code § 245.002(1). Additionally, the Human Life Protection Act limits only those abortions performed "knowingly"; an "accidental or unintentional injury or death" of an unborn child "does not constitute a violation." *Id.* § 170A.002(a), (d).

judgment, the law permits an abortion without inquiring into a physician's state of mind. At the same time, the law demands that medical facts support the need for an abortion permitted under the Act. A doctor may not disregard the requirement that the mother must have a life-threatening physical condition or that the condition must place the mother at risk of death or serious risk of substantial impairment of a major bodily function unless an abortion is performed.

The Center does not argue that the Texas Constitution requires the Legislature to accept a physician's *belief* over a physician's *diagnosis* based on the facts presented and reasonable medical judgment. With respect to this dispute, the exercise has not been so much an interpretation of what "reasonable medical judgment" means—after all, the Legislature has defined it. Instead, the Center's ask is for a court to substitute a different standard for the one that is expressly written in the statute. This is a call for amending the law, not for interpreting it.

**B**

**Life-Threatening Physical Condition**

The Texas law permitting an abortion requires that the mother have a "life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced."[46] The Center complains that this requirement is confusing, and thus it urged the trial court to adopt a different standard.

---

[46] Tex. Health & Safety Code § 170A.002(b)(2).

The statute requires that the mother have a "life-threatening physical condition." "Life-threatening" means "capable of causing death [or] potentially fatal."[47] Black's Law Dictionary defines it as "[o]f, relating to, or involving illness, injury, or danger that could cause a person to die."[48] As the State's expert acknowledged, a "life-threatening physical condition" is not necessarily one actively injuring the patient; it is a condition that has the potential to kill the patient. The condition must arise from or be aggravated by the pregnancy, but death need not be imminent, as we observed in *In re State*.[49] The law does not require the life-threatening physical condition to have already caused damage before a physician can act to preserve the mother's life or major bodily function.[50]

The final clause of the law confirms that the "life-threatening physical condition" does not require a manifestation of that risk. The life-threatening physical condition must "place[] the female at risk of death or pose[] a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced."[51] The physician's reasonable medical judgment must be that an abortion will avert the risk posed by the mother's life-threatening physical condition.

In short, a physician must perform a two-step inquiry, using reasonable medical judgment, to determine if the Act permits an

---

[47] *Life-threatening*, Merriam-Webster Online (2024).

[48] *Life-threatening*, Black's Law Dictionary (11th ed. 2019).

[49] 682 S.W.3d at 894.

[50] *Id.*

[51] Tex. Health & Safety Code § 170A.002(b)(2).

abortion. Does the patient have a physical condition aggravated by, caused by, or arising from her pregnancy that could lead to her death? If so, does the condition pose a risk of death or serious risk of substantial impairment of a major bodily function unless an abortion is performed?

In this case, we have an example of a risk that satisfies the law's inquiry. The experts agreed that an abortion is recommended to prevent a woman's death or serious bodily injury if she develops preterm pre-labor rupture of membranes (or PPROM). The Legislature since has amended other laws to plainly indicate that a physician who performs an abortion in response to such a diagnosis is not liable under the Human Life Protection Act.[52] With a diagnosis based on reasonable medical judgment and the woman's informed consent, a physician can provide an abortion confident that the law permits it in these circumstances. Ms. Zurawski's agonizing wait to be ill "enough" for induction, her development of sepsis, and her permanent physical injury are not the results the law commands.[53]

The trial court's order, however, does away with the statute's two-part inquiry and permits abortions for any "unsafe" pregnancy. All pregnancies carry risks. The law limits permitted abortions to address life-threatening conditions "aggravated by, caused by, or arising from a pregnancy." While merely being pregnant may increase a mother's risk of death or injury, pregnancy itself is not a "life-threatening physical

---

[52] *See* Act of May 26, 2023, 88th Leg., R.S., ch. 913, §§ 1, 3 (codified at Tex. Civ. Prac. & Rem. Code § 74.552 and Tex. Penal Code § 9.35).

[53] The Legislature also has shielded physicians from liability for abortions performed to treat an ectopic pregnancy. *See id.*

condition" under the law. In differentiating ordinary risks attendant to pregnancy—those that can be treated short of an abortion—from conditions for which the law permits an abortion, the Legislature drew the line at "life-threatening physical condition." Because the trial court's order opens the door to permit abortion to address any pregnancy risk, it is not a faithful interpretation of the law. A trial court has no discretion to incorrectly interpret the law in ordering a temporary injunction.[54]

The trial court also ordered that the law permit abortions for "a fetal condition where the fetus is unlikely to survive the pregnancy and sustain life after birth." The Center argues that an abortion should be permitted when an unborn child's diagnosis is such that the child is "unlikely" to "sustain life after birth," even if that condition does not present a life-threatening risk to the mother. The current law, however, plainly does not permit abortion based solely on a diagnosis that an unborn child has an abnormal condition, even a life-limiting one.[55]

---

[54] *Harris County*, 672 S.W.3d at 7–8. The same is true for the part of the order permitting abortion for any "condition exacerbated by pregnancy, that cannot be effectively treated during pregnancy, or that requires recurrent invasive intervention."

[55] Some states that otherwise restrict abortion exclude cases in which the child's diagnosis is lethal. *See* Ind. Code § 16-34-2-1 (excepting a fetus "diagnosed with a lethal fetal anomaly"); La. Stat. Ann. § 14:87.1(1)(b)(vi), (19)(a) (defining abortion as excluding the "removal of an unborn child who is deemed to be medically futile" which is defined as "in reasonable medical judgment as certified by two physicians, the unborn child has a profound and irremediable congenital or chromosomal anomaly that is incompatible with sustaining life after birth"); W. Va. Code §§ 16-2R-3(a)(1); 16-2R-2 (excepting abortion for a fetus with "a lethal anomaly which renders it incompatible with life outside of the uterus"); Wyo. Stat. Ann. § 35-6-124(a)(iv) (excepting

Rather, the law examines such a diagnosis in the context of the mother's physical health. An unborn child's diagnosis must be coupled with reasonable medical judgment that the mother has a life-threatening physical condition and that an abortion is indicated to avert her death or serious physical impairment.[56]

# V

## Constitutional Claims

As we have construed the Human Life Protection Act in Part IV, an abortion is permitted when a physician exercising reasonable medical judgment determines that a life-threatening physical condition has arisen during a woman's pregnancy and an abortion is indicated to avert the woman's risk of death or a serious risk of substantial bodily injury. The law does not require a woman to surrender her life or to first suffer serious bodily injury before an abortion may be performed. Given this construction, the history of abortion regulation and the text of the Texas Constitution—which does not include general health or abortion among the rights it protects—do not suggest state constitutional boundaries broader than current law affords. We address the Center's constitutional arguments in turn.

---

abortions "when in the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal anomaly"). None adopts the Center's proposed "unlikely to sustain life" standard.

[56] This is not to say that a physician cannot treat the child in utero in such circumstances. The definition of abortion excludes acts done to save the life or preserve the health of an unborn child. Tex. Health & Safety Code § 245.002(1)(A).

## A
## Due Course of Law

The due-course clause of the Texas Constitution states that no citizen "shall be deprived of life . . . except by the due course of the law of the land."[57] An unsettled question in this Court is whether the due-course clause protects substantive rights in addition to procedural rights.[58] We need not decide this question today. Even if the due-course clause were to encompass substantive rights, the evidence adduced does not support the trial court's order that the Human Life Protection Act violates the Texas Constitution.

If the due-course clause affords fundamental rights as a matter of substantive law and not just procedural protections before the government invades them, the right to life would be found among them. The due-course clause has referred to "life" since statehood.[59] The Center argues that the due-course guarantee of "life" extends more generally to a person's "health," invoking legal commentators who

---

[57] Tex. Const. art. I, § 19.

[58] *See Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 675 (Tex. 2022) (Young, J., concurring) (discussing inconsistent treatment of the due-course clause and suggesting that it is not "a freestanding font of substantive rights").

[59] Tex. Const. of 1845, art. I, § 16 ("No citizen of this State shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land."); *see also Henderson v. State*, 962 S.W.2d 544, 561 (Tex. Crim. App. 1997) ("Life is surely the most basic right of all.").

include health as a personal right.[60] The State responds that these commentators understood that "life" also includes the life of an unborn child and laws prohibiting abortion have existed since that time. Recognition of a fundamental right may take both lives into account.

The State has regulated abortion in Texas for as long as the due-course clause has protected "life."[61] Before the United States Supreme Court declared Texas's criminal abortion laws unconstitutional in 1973 in *Roe v. Wade*,[62] Texas law prohibited abortion unless "procured or attempted to be procured by medical advice for the purpose of saving the life of the mother."[63] After that decision, Texas regulated abortion within *Roe*'s limits, contouring those regulations to permit abortions necessitated in medical emergencies.[64] The Human

[60] *See* 1 William Blackstone, Commentaries, *125 (noting a "right of personal security" that "consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation"); John Locke, Second Treatise of Government 9, § 6 (C.B. Macpherson ed., Hackett Publ'g Co., 1980) (1690) (describing man's obligation not to "take away, or impair the life, or what tends to the preservation of the life, the liberty, health, limb or goods of another").

[61] *Compare* Act approved Feb. 9, 1854, 5th Leg., R.S., ch. 49, § 1, 1854 Tex. Gen. Laws 58, 58, *reprinted in* 3 H.P.N. Gammel, The Laws of Texas 1822–1897, at 1502, 1502 (Austin, Gammel Book Co. 1898), *with* Tex. Const. of 1845, art. I, § 16.

[62] 410 U.S. 113 (1973).

[63] Tex. Penal Code of 1856, art. 536. We have found no case, nor have the parties cited any cases, interpreting and applying the law permitting abortion to save the life of the mother.

[64] *See, e.g.*, Act of May 25, 1999, 76th Leg., R.S., ch. 395, § 1, 1999 Tex. Gen. Laws 2466, 2467 (codified as revised at Tex. Fam. Code ch. 33) (requiring parental notice for abortion provided to minors except if "a condition exists that . . . necessitates the immediate abortion of her pregnancy to avert her death or

30

to avoid a serious risk of substantial and irreversible impairment of a major bodily function"); Woman's Right to Know Act, 78th Leg., R.S., ch. 999, § 1, 2003 Tex. Gen. Laws 2930, 2931 (codified as revised at Tex. Health & Safety Code § 171.012) (requiring informed consent before performing an abortion, "[e]xcept in the case of a medical emergency"). In 2011, the Legislature clarified that "medical emergency" means "a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed." Act of May 5, 2011, 82d Leg., R.S., ch. 73, § 1, 2011 Tex. Gen. Laws 342, 342, 346 (codified as revised at Tex. Health & Safety Code §§ 171.002(3) & 171.0124). The Legislature also barred state funding for hospital districts that "use[] tax revenue of the district to finance the performance of an abortion," except for abortions performed "in the case of a medical emergency." Act of June 27, 2011, 82d Leg., 1st C.S., ch. 7, § 15.02, 2011 Tex. Gen. Laws 5390, 5462 (codified at Tex. Health & Safety Code § 285.202). "Medical emergency" included both "severe fetal abnormality" and a condition that "in a physician's good faith clinical judgment, complicates the medical condition of the pregnant woman and necessitates the immediate abortion of her pregnancy to avert her death or to avoid a serious risk of substantial impairment of a major bodily function." *Id.* A "severe fetal abnormality" is defined as "a life threatening physical condition that, in reasonable medical judgment, regardless of the provision of life saving medical treatment, is incompatible with life outside the womb." *Id.* In 2013, the Legislature banned abortions performed more than twenty weeks post-fertilization unless "there exists a condition that, in the physician's reasonable medical judgment, so complicates the medical condition of the woman that, to avert the woman's death or a serious risk of substantial and irreversible physical impairment of a major bodily function, other than a psychological condition, it necessitates" an abortion. Preborn Pain Act, 83d Leg., 2d C.S., ch. 1, § 3, 2013 Tex. Gen. Laws 5013, 5014 (codified at Tex. Health & Safety Code § 171.046). The statute did not prohibit an abortion if "performed on an unborn child who has a severe fetal abnormality." *Id.* at 5015 (codified at Tex. Health & Safety Code § 171.046(c)). In 2017, the Legislature banned dismemberment abortions and partial-birth abortions. Act of May 26, 2017, 85th Leg., R.S., ch. 441, § 6, 2017 Tex. Gen. Laws 1164, 1165–67 (codified at Tex. Health & Safety Code §§ 171.101–.154). For dismemberment abortions, the Legislature reserved an exception for those "necessary in a medical emergency," giving "medical emergency" the same definition as the 2011 informed-consent law. *Id.* at 1166, 1172 (codified at Tex. Health & Safety Code § 171.152(a) and Tex. Occ. Code § 164.062(a)(19)). For partial-birth abortions, the Legislature excepted abortions "necessary to save the life of a mother

Life Protection Act became effective "the 30th day after . . . the issuance of a United States Supreme Court judgment" returning regulatory authority of abortion to the states.[65] In permitting abortion to address the mother's life-threatening condition to avert her risk of death or serious physical impairment, the Act is consistent with earlier versions of Texas law.

The history of abortion regulation in Texas demonstrates the Legislature's unmistakable commitment to protecting the lives of pregnant women experiencing life-threatening complications while also valuing and protecting unborn life. Throughout the decades, no settled formulation of the scope of that protection existed. Even so, no court declared any historical law regulating abortion unconstitutional under the Texas Constitution's due course of law provision—or any other provision.

In this case, Dr. Karsan did not present evidence that she desired to provide a particular patient with an abortion that, in her view, the Texas Constitution requires but the statute forbids. Dr. Karsan did not provide specifics but instead listed pregnancy complications for which she would consider offering an abortion. The Center argues that

---

whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy." *Id.* at 1165 (codified at Tex. Health & Safety Code § 171.102(b)).

[65] Human Life Protection Act of 2021, 87th Leg., R.S., ch. 800, § 3, 2021 Tex. Gen. Laws 1886, 1887. The Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), satisfied the effectiveness condition.

abortion in these situations must be lawful under the Human Life Protection Act; otherwise, the statute is unconstitutional.

Courts do not issue injunctions, however, based on lists of hypothetical future possibilities. "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation. The demand for specificity, therefore, stems from a judicial desire for better lawmaking."[66] A court does not strike down a law as unconstitutional based on a hypothetical situation.[67] Thus, to obtain a judicial decree enjoining a state law, Dr. Karsan's claim must be proven with sufficient specificity—an adjudication in a particular case. Guidance about a law's application outside of a redressable injury is a proper undertaking for the other two branches of government. The Legislature anticipates and shapes the future.[68] The executive branch implements statutes through

---

[66] *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) (quoting Gene R. Nichol, Jr., *Ripeness and the Constitution*, 54 U. Chi. L. Rev. 153, 177 (1987)). Dr. Karsan's testimony described one patient with some detail: a mother with a subchorionic bleed. Dr. Karsan testified that she considered the mother's bleeding significant enough to recommend an abortion, but a maternal–fetal medicine specialist did not agree with that assessment. Dr. Karsan's testimony reveals that her decision was rooted in her compliance with hospital policy, not in the legal standard for permitting an abortion.

[67] *See Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 (Tex. 2007) ("[T]here is no need to strike [a statute] down because it might operate unconstitutionally in another case.").

[68] *Hous. Tap & Brazoria Ry. Co. v. Randolph*, 24 Tex. 317, 344 (1859) ("The judiciary act on past facts. The legislature acts by devising for the future. It is the peculiar province of the legislative department, to shape future events, so as to obviate and remedy, the jars and difficulties of the past.").

rulemaking.[69] But the judiciary dwells in the house of the concrete past, assembled through the gradual accretion of judgments in specific cases.

The Center points to the decisions of other state high courts to argue that the Texas Constitution's guarantee of "life" covers more than "biological existence."[70] We have no difficulty agreeing, in the abstract, and have construed this Texas statute consistently with its text as not requiring that the mother be in imminent peril or first suffer serious physical impairment to receive an abortion. The law entrusts physicians with the profound weight of the recommendation to end the life of a child to preserve the life of the mother, a decision made in light of the specific

---

[69] *E.g.*, Tex. Gov't Code § 2001.021; *see also In re State*, 682 S.W.3d at 894 & n.5.

[70] The Supreme Court of Oklahoma interpreted one abortion statute to require "a woman to be in actual and present danger in order for her to obtain a medically necessary abortion" and consequently struck it as unconstitutional, but it upheld a second statute permitting abortions done to "preserve [the woman's] life." *Okla. Call for Reprod. Just. v. Drummond*, 526 P.3d 1123, 1131–32 (Okla. 2023). The Supreme Court of North Dakota upheld a preliminary injunction against an abortion statute that provided only an affirmative defense that abortion was necessary to prevent the death of the woman and interpreting their constitution as protecting against "severe, life altering damage." *Wrigley v. Romanick*, 988 N.W.2d 231, 242–44 (N.D. 2023). The Supreme Court of Idaho upheld an abortion statute that excepted abortions "necessary to prevent the death of the pregnant woman," holding that that language "leaves wide room for the physician's 'good faith medical judgment.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. State*, 522 P.3d 1132, 1203–04 (Idaho 2023) (quoting Idaho Code § 18-622(3)(a)(i)–(ii)). The Supreme Court of Indiana vacated a preliminary injunction against an abortion statute, acknowledging that the Indiana Constitution's right to protect one's own life "extends beyond just protecting against imminent death, and it includes protecting against 'great bodily harm.'" *Members of the Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky.*, 211 N.E.3d 957, 976 (Ind. 2023) (quoting *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021)).

circumstances of the mother and the pregnancy. We do not foreclose a due course of law challenge as a defense to civil or criminal enforcement in a specific case. We conclude, however, that Dr. Karsan did not meet her burden to show that a constitutional right to life or health is broader than what the law currently affords.

## B

## Equal Protection

The Center also challenges the Human Life Protection Act under the equal protection provisions of the Texas Constitution. The Texas Constitution provides that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin."[71] The Center argues that the Act violates this provision because only women can become pregnant and potentially seek an abortion.

Our Court considered and rejected this argument over twenty years ago in *Bell v. Low Income Women of Texas*.[72] In that case, abortion providers challenged the Hyde Amendment's prohibition of the use of federal funds to provide abortions, except "in the case where a woman suffers from a physical disorder, physical injury, or physical illness,

---

[71] Tex. Const. art. I, § 3a. Section 3 provides, "All freemen, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." *Id.* § 3. Section 3a more specifically protects against discrimination on the basis of a protected class, and because we conclude that the Center has not made its case under that section, we decline to separately analyze the claims under Section 3. *See In re McLean*, 725 S.W.2d 696, 698 (Tex. 1987) ("[W]e conclude that the Equal Rights Amendment [Section 3a] is more extensive and provides more specific protection than both the United States and Texas due process and equal protection guarantees.").

[72] 95 S.W.3d 253 (Tex. 2002).

including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed."[73] Our Court held that the "classification here is not so much directed at women as a class as it is abortion as a medical treatment, which, because it involves a potential life, has no parallel as a treatment method."[74] Applying rational-basis review, the Court determined that the law served a legitimate governmental purpose and thus upheld the funding scheme.[75] For similar reasons, the United States Supreme Court likewise has held that the Hyde Amendment did not discriminate under the federal equal protection clause.[76]

Like the law under review in *Bell*, the Human Life Protection Act regulates the provision of abortion.[77] The Act does not single out a protected class for disparate treatment but instead differentiates among medical indications for an abortion, regulating the provision of medical care within that class. Because the law does not discriminate against a protected class, courts must uphold it if a rational basis exists for it.[78] Under this standard, "a party asserting that a classification is

---

[73] *Id.* at 256 (quoting Consolidated Appropriations Act, Pub. L. No. 106–554, Appendix A, H.R. 5656, § 509(a)(2), 114 Stat. 2763, 2763A-70 (2001)).

[74] *Id.* at 258.

[75] *Id.* at 264.

[76] *Harris v. McRae*, 448 U.S. 297, 322–23 (1980).

[77] *See* 95 S.W.3d at 263–64.

[78] *Id.* at 264.

unconstitutional must demonstrate that the action is not rationally related to a legitimate governmental purpose."[79] We uphold the classification if it reasonably promotes the governmental purpose.[80]

In particular, the Center argues that the State lacks a rational interest in regulating abortion in response to diagnosed fetal abnormalities. The Center advocates that abortion be permitted when an unborn child is "unlikely" to have a "sustained" life, beyond "hours or days." The State responds that it has a legitimate, long-recognized interest in regulating abortion to protect unborn life.

As painful as such circumstances are, that the law does not authorize abortions for diagnosed fetal conditions absent a life-threatening complication to the mother does not render it unconstitutional. Even before the Supreme Court overturned *Roe v. Wade*, courts recognized that legitimate interests support abortion regulation laws, including "preservation of prenatal life at all stages of development" and the "protection of maternal health and safety."[81] The balance the Legislature has struck is not assailable in court because a different balance arguably achieves these purposes.

The Center argues that the State's interest in prenatal life fades when "the health risks to the pregnant patient and the fetus are so severe that the pregnancy will never result in a child with sustained life." But in situations where the mother has such a risk, manifested as

---

[79] *Id.* (citing *Richards v. League of United Latin Am. Citizens*, 868 S.W.2d 306, 310–11 (Tex. 1993)).

[80] *Klumb*, 458 S.W.3d at 13.

[81] *Dobbs*, 597 U.S. at 301.

a life-threatening physical condition, current law permits an abortion to address the mother's risk of death or serious physical impairment. We conclude that the temporary-injunction record does not demonstrate that the Act lacks a rational relationship to a legitimate governmental purpose such that the Act violates Texas's equal protection clauses.

*      *      *

Texas law permits a life-saving abortion. Under the Human Life Protection Act, a physician may perform an abortion if, exercising reasonable medical judgment, the physician determines that a woman has a life-threatening physical condition that places her at risk of death or serious physical impairment unless an abortion is performed. The law permits a physician to intervene to address a woman's life-threatening physical condition before death or serious physical impairment are imminent.

Because the trial court's injunction departed from the law as written without constitutional justification, we vacate its order.

Jane N. Bland
Justice

**OPINION DELIVERED:** May 31, 2024